## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HID Global Corporation,<br><br>               Plaintiff,<br><br>      v.<br><br>Ajay Jain, Vikrant Ghai, and Shailendra Sharma,<br><br>               Defendants. | Case No. 1:21-cv-10828<br><br>**COMPLAINT** |

Plaintiff HID Global Corporation ("HID") brings this action against Defendants Ajay Jain, Vikrant Ghai, and Shailendra Sharma (collectively, "Defendants") as follows:

### NATURE OF THE ACTION

1. This action seeks redress for Defendants' breach of Non-Competition and Non-Solicitation Agreements that they each entered into in connection with the sale of a business to HID and for misappropriation of HID's trade secrets to launch a company and product that directly compete with HID.

2. For many years leading up to 2015, all three Defendants were high-ranking, key executives and substantial equity holders of a company called Quantum Secure, Inc ("Quantum Secure"). Quantum Secure provided enterprise software to manage and streamline security identities, access compliance, and provisioning access across disparate physical security systems. This software, thus, simplified the management of physical security access, such as electronic key fob access to buildings, in systems using proprietary components provided by different suppliers.

3. In February 2015, HID and Quantum Secure entered into an Agreement and Plan of Merger (the "Merger Agreement") whereby HID acquired Quantum Secure for $80 million

dollars with an opportunity for the Quantum Secure shareholders to earn up to an additional $80 million dollars based on the achievement of certain revenue goals. As a result of the actions contemplated by the Merger Agreement, HID acquired Quantum Secure's technology, intellectual property and goodwill.

4.       To protect the goodwill, trade secrets, and customer relationships of Quantum Secure, and as a material inducement to HID consummating the transactions contemplated by the Merger Agreement that resulted in multi-million dollar payments to Defendants, each of the Defendants entered into a Non-Competition and Non-Solicitation Agreement that remained in effect for at least five years from March 25, 2015, the closing date of the Merger Agreement (the "Closing Date"). Quantum Secure's key employees immediately joined HID. At the time of the acquisition, Ajay Jain was Quantum Secure's President and CEO, Vikrant Ghai was its CTO, and Shailendra Sharma was VP of Engineering and R&D. Defendants continued their executive employment in similar roles after HID acquired Quantum Secure.

5.       About three years after the Closing Date, Defendants Ajay Jain's and Vikrant Ghai's employment with HID terminated. Their obligations to refrain from competition with HID, however, remained through the five-year anniversary of the Closing Date (*i.e.* March 25, 2020).

6.       Despite those obligations, Ajay Jain and Vikrant Ghai began work in direct competition to HID and, by at least March 21, 2019, launched a competing company called Vector Flow, Inc. ("Vector Flow"). By 2020, Shailendra Sharma formally joined the other Defendants at Vector Flow.

7.       Vector Flow, like Quantum Secure and HID, provides enterprise software for managing security identities and physical security access. Vector Flow offers the "Vector Flow

AI Enabled Physical Security Automation Platform," which provides the base for its system, as well as a "Physical Workforce Identity Suite," providing workforce identity automation functionality, and a "SOC Automation Suite," for automating security operations and improving physical security. *See* https://vectorflow.com/platform-overview/.

8.     By participating in the development and launch of this directly-competing venture and products, including pre-launch work to develop such offerings, Defendants have breached their agreements with HID.

9.     Worse yet, Defendants appear to have used HID's trade secret source code in their launch of Vector Flow and the development of its products. Given their highly critical positions at Quantum Secure (pre-acquisition) and HID (post-acquisition), the Defendants had substantial access to a wealth of confidential information about HID's business and technology, including HID's source code. Based on information and belief, and on publicly available information about the Vector Flow products, HID believes that Defendants have used that insider access to assist in the development of Vector Flow's directly competing products and to do so much more quickly than if Vector Flow had started from scratch. The use of HID's source code is evident from the inclusion in the Vector Flow offerings of multiple functions that are both time-consuming to develop and valuable to only a small number of potential consumers of the products. It would represent a staggering misallocation of resources for a new identity/security management software company, such as Vector Flow, to develop and include such features in an initial launch or early stage product. Indeed, much of this niche software functionality only exists in HID's product because it was developed over many years based on specific requests from customers. On information and belief, the fact that such features now appear in Vector Flow's nascent products, coupled with Defendants access to HID source code and proprietary technology,

indicates that Defendants misappropriated trade secret HID source code and used it as a foundation for Vector Flow's software.

10.     HID therefore brings this action for breach of contract and violations of the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. (the "DTSA").

## PARTIES

11.     Plaintiff HID is a Delaware corporation with its principal place of business in Austin, Texas.

12.     On information and belief, Defendant Ajay Jain is a United States citizen, residing in California.

13.     On information and belief, Defendant Vikrant Ghai is a United States citizen, residing in California.

14.     On information and belief, Defendant Shailendra Sharma is a United States citizen, residing in California.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy in this matter exceeds $75,000.00. This Court also has original jurisdiction over this action under the DTSA and 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over HID's related claims pursuant to 28 U.S.C. § 1367 because all of HID's claims are interrelated and form part of the same case or controversy.

16.     Further, each Defendant's Non-Competition and Non-Solicitation Agreement with HID provides for exclusive jurisdiction in the courts of the State of New York and the federal courts of the United States of America located within New York County in the State of

New York.

17.     This Court has personal jurisdiction over Defendants because each Defendant's Non-Competition and Non-Solicitation Agreement with HID includes explicit consent to jurisdiction in the federal courts of the United States of America located within New York County in the State of New York.

18.     Venue is proper in this Court because each Defendant's Non-Competition and Non-Solicitation Agreement with HID includes explicit consent to venue in the federal courts of the United States of America located within New York County in the State of New York.

## **BACKGROUND**

19.     HID is a worldwide leader in trusted identity solutions. Its products range from physical access products, like ID cards and readers for opening doors, to solutions for accessing digital networks, verifying transactions, and tracking assets. Millions of people around the world use HID products and services to navigate their everyday lives, and over 2 billion things are connected through HID technology. HID Global has over 3,000 employees worldwide and operates international offices that support more than 100 countries.

20.     HID serves its clients by providing various products and solutions for a wide array of industries throughout the United States and across the globe.

21.     HID has developed proprietary and confidential approaches to ensure access to its customers' physical and digital assets remains secure. HID's hardware development is the first step, but powerful software solutions are also necessary to implement HID's hardware in customer applications. HID has therefore developed first in class software products that integrate seamlessly with trusted identity solutions for physical and logical access, citizen identification, financial instant issuance, and chip technology. For example, HID's Identity Management

software allows customers to create and manage secure identities from the customer's first interaction with an employee or user to the end of that identity's lifecycle. Its Physical Access Control software powers its physical access hardware (like badge readers) to ensure that access is provided to only the right people at the right time. And its Internet of Things software provides a platform to monitor and control connected devices.

<u>**HID Acquires Quantum Secure**</u>

22.     Prior to working for HID, all three Defendants served as high-level executives for Quantum Secure. Ajay Jain co-founded Quantum Secure and was Quantum Secure's President and CEO, Vikrant Ghai was a co-founder of the company and Chief Technology Officer, and Shailendra Sharma was its Vice President of Engineering and Research & Development. By virtue of their high ranks at Quantum Secure, Defendants enjoyed unfettered access to Quantum Secure's proprietary technology and trade secrets.

23.     In 2015, HID acquired Quantum Secure, and the Defendants became HID employees as part of that transaction.

24.     Each Defendant was a substantial equity holder and key executive of Quantum Secure before the acquisition. When HID acquired Quantum Secure, each Defendant had extensive and valuable knowledge and confidential information concerning Quantum Secure's technology and business. As a result of the transactions contemplated by the Merger Agreement, each Defendant received substantial consideration. That consideration was premised on HID's ability to fully exploit Quantum Secure's confidential and proprietary business information and trade secrets and also the significant goodwill that was an important part of Quantum Secure's value to HID.

<u>**Defendants Agreed to Refrain from Competition with HID**</u>

25.     As a material condition to HID and Quantum Secure entering into the Merger

Agreement, each of the Defendants entered into Non-Competition and Non-Solicitation

Agreements. In so doing, each Defendant acknowledged and agreed that (a) he was a key

executive and substantial shareholder of Quantum Secure; (b) he had obtained and developed

extensive and valuable knowledge and confidential information concerning the business of

Quantum Secure; (c) as a result of the transactions contemplated by the Merger Agreement, the

Defendant would receive substantial consideration in connection with the acquisition of

Quantum Secure by HID through the sale of all of the Defendant's equity in Quantum Secure;

(d) the Defendant had access to, had been provided with, and/or had prepared and created

confidential and proprietary business information and trade secrets belonging to Quantum

Secure; (e) the Defendant developed on behalf of Quantum Secure significant goodwill that was

a significant part of the value of the Company; and (f) the Defendant entering into the Non-

Competition and Non-Solicitation Agreement was a material inducement to Quantum Secure

entering into the Merger Agreement.

26.     Each of the Non-Competition and Non-Solicitation Agreements provide that:

**1.1 General.** For a period of five (5) years following the Closing Date (the
"Restricted Period"), Shareholder shall not, and shall not permit any of
Shareholder's controlled Affiliates to, directly or indirectly, either alone or in
association or in connection with or on behalf of any Person now existing or
hereafter created (other than by or on behalf of the Company): (a) be or become
engaged in or participate in, whether as an owner, operator, investor, partner, joint
venturer, guarantor, shareholder, member, director, manager, officer, employee,
advisor, consultant, agent or otherwise, the business of designing, developing,
manufacturing, marketing, providing, producing, selling, licensing and/or
distributing products or services that compete, or attempt to compete, with the
business, as conducted or as proposed to be conducted, or the products or services
of the Company, provided or as proposed to be provided, in each case as of the time
Shareholder ceases providing services to Company, Parent or any of their affiliated
entities, including but not limited to physical identity and access management
software and solutions, physical identity security intelligence software and
solutions, physical security compliance and physical security risk management

software and solutions, physical security mobile and cloud based software and solutions related physical identity, access management, compliance and risk management, Commercial Identity Verification ("CIV") smart card software and solutions, physical security access audits and compliance, and physical security identity analytic software and solutions (the "Restricted Business") anywhere in the United States of America, Brazil, India, United Kingdom and any other cities, towns, counties, states, provinces, countries and other territories anywhere in North America, South America, Europe, Asia, Africa, Australia or anywhere else in the world (collectively, the "Restricted Area"), (b) use or authorize the use of his, her or its name or any part thereof in connection with any Restricted Business other than by or on behalf of the Company, (c) solicit or induce any customer, supplier or vendor of the Company (i) to terminate its relationship with the Company, (ii) to alter in a manner adverse to the Company its relationship with the Company, or (iii) in the case of a customer, for the purpose of providing such customer with products or services that are part of the Restricted Business or compete with products or services that are developed, marketed, sold, licensed, distributed or provided by the Company, or (d) solicit, encourage, recruit or induce any employee, independent contractor or consultant of the Company (including any employee, independent contractor or consultant of the Company whose employment or engagement with the Company ended due to a voluntary resignation within three months prior to such solicitation) to terminate his or her employment or consulting relationship with the Company (or Parent or any of its Affiliates) or to become employed or engaged by Shareholder or any third party; provided, however, that it shall not be a violation of clause (d) of this Section 1.1 for Shareholder to publish general advertisements for employment not directed at the Company, Parent or its Affiliates, or their employees or independent contractors (provided, however, that such exception shall not extend to blast emails or messages that Shareholder sends on social media (such as Twitter, Facebook, or LinkedIn)).

27.     The Non-Competition and Non-Solicitation Agreements also recognize the

irreparable nature of the harm that breach would cause to HID. The agreements all provide that:

**3. Breach.** Shareholder acknowledges that in the event of a breach of any of the provisions of this Agreement by Shareholder, Buyer, the Company, and/or their respective successors would sustain irreparable harm, and, therefore, Shareholder agrees that in addition to any other remedies which Buyer or the Company may have under this Agreement or otherwise, Buyer, the Company and/or their respective successors shall be entitled to obtain equitable relief (without the posting of any bond), including but not limited to specific performance, temporary restraining orders, and preliminary and permanent injunctive relief restraining Shareholder from committing or continuing any such violation of this Agreement. The Restricted Period shall be extended for the period equal to the time period that Shareholder is in breach of any provision of this Agreement.

**<u>HID's Trade Secret Information</u>**

28.     HID has devoted substantial resources over many years to developing its products, including the software that powers them. HID has also expended significant resources acquiring intellectual property, such as the consideration HID paid to the founders of Quantum Secure, which was premised on HID's ability to fully exploit Quantum Secure's confidential and proprietary business information and trade secrets. HID therefore takes extensive efforts to maintain such information, including source code, as confidential trade secrets.

29.     HID's trade secrets include its software source code and confidential, proprietary information relating to physical identity and access management software and solutions, physical identity security intelligence software and solutions, physical security compliance and physical security risk management software and solutions, physical security mobile and cloud based software and solutions related physical identity, access management, compliance and risk management, Commercial Identity Verification ("CIV") smart card software and solutions, physical security access audits and compliance, and/or physical security identity analytic software and solutions.

### HID's Reasonable Measures to Protect its Trade Secrets

30.     HID takes reasonable efforts to protect its trade secrets, including its proprietary source code.

31.     HID has established trade secret policies for all its employees and requires all employees to execute strict confidentiality agreements. Even among its own employees, HID limits which specific employees are allowed to access specific types of trade secret information.

32.     HID has numerous policies in place to protect confidential information, including HID's trade secrets. For example, HID's Acceptable Use Policy governs the use of HID's information systems, devices, and other information assets. HID's employee handbook explicitly

instructs employees on the requirements to protect HID's trade secrets and private confidential information, while also instructing HID employees to not use or disclose trade secrets or private confidential information of third parties. And its Information Security Policy defines the direction, principles, responsibilities and rules governing information security management at HID.

33.     HID implements even more stringent policies for the type of trade secrets at issue here and for HID's Identity and Access Management Solutions business unit--the business unit where defendants were employed and that develops HID's "SAFE™" software suite. For example, the Access Control Policy of that business unit sets the requirements for access to systems in the HID environment. Its Engineering Systems Access Security Policy and Engineering Systems Access Security procedures set out rules and procedures for access control to HID's information technology systems during product development. And its Standards for Engineering Systems Access Control explicitly delineates which groups will have what level of access to specific pieces of source code.

34.     The aforementioned policies are representative of HID's efforts to protect its confidential information, including trade secrets, but the list is far from exhaustive.

35.     HID trains its employees on its policies for the treatment of confidential information, including its trade secrets. At these trainings, HID instructs its employees to keep the nature and details of its trade secrets confidential, including source code. Security awareness training at HID includes reviewing HID policies, coding practices, policies for using third-party components, cryptography, and completing tests to ensure that HID employees understand how to treat confidential information and how to keep HID's systems secure.

36.     HID limits access to trade secrets to employees and contractors who have a

demonstrable need to know such information. HID takes measures to ensure that contractors and vendors protect HID's trade secrets, to the extent that they are ever allowed to access them. HID's only provides trade secrets, including source code, to its contractors and vendors on a need-to-know basis, and requires them to execute contracts obligating them to keep such information strictly confidential.

37.    HID monitors computer access to its systems. HID secures all its computer networks behind a firewall, such that nobody outside of HID can access the networks without HID's authorization. HID also protects its trade secrets, including source code, through other electronic security measures, including but not limited to ensuring that networks hosting such trade secrets are encrypted, require passwords, and require dual-factor authentication for access. Devices such as computers, tablets, and mobile phones provided to employees are also encrypted, password-protected, and subject to other security measures.

38.    HID maintains physical security in all its buildings. HID employs locks, security cameras, guards, and other measures to control access to its physical facilities, including facilities where trade secrets are located. All doors leading into facilities where HID maintains trade secrets are locked at all times. To gain access to HID's facilities, persons must have keycards issued by HID that include their photographs. Only HID employees, temporary employees, and eligible vendors, associates, and contractors receive keycards. Any person who does not have a keycard must be escorted by a HID employee while within HID's facilities.

**Defendants Remain High-Ranking Executives with Access to HID's Trade Secrets Following HID's Acquisition of Quantum Secure**

39.    After the closing of the transactions contemplated by the Merger Agreement, Quantum Secure's intellectual property—including its trade secrets—became HID's intellectual property. HID worked to integrate its newly-acquired technology into HID's offerings, including

by using the Quantum Secure source code as the foundation for at least HID's "SAFE™" software suite. While employed by HID, the Defendants continued to occupy high-ranking positions with access to HID's confidential business information and its proprietary technology. Indeed, at least one of the Defendants had administrative access and control of HID's source code management system through early 2020.

## Defendants Use HID's Trade Secrets to Compete with HID

40.     Defendants Ajay Jain and Vikrant Ghai left HID in 2018. Ajay Jain's employment terminated on March 13, 2018, and Vikrant Ghai's employment terminated shortly thereafter on March 29, 2018.

41.     On March 21, 2019, a company called Vector Flow, Inc. ("Vector Flow") was incorporated in Delaware, and on April 4, 2019, Ajay Jain registered Vector Flow with the California Secretary of State. Ajay Jain was named the President and CEO of Vector Flow, and Vikrant Ghai was named its Vice President and CTO. Shailendra Sharma remained at HID until February 12, 2020, when he left HID to join Vector Flow and lead its R&D and Engineering teams as Vector Flow's VP of Engineering and R&D.

42.     Despite its brief existence, Vector Flow quickly launched its products to compete with HID. Vector Flow's website shows that it has offered, and continues to offer, services and products including physical identity and access management software and solutions, physical identity security intelligence software and solutions, physical security compliance and physical security risk management software and solutions, physical security mobile and cloud based software and solutions related physical identity, access management, compliance and risk management, Commercial Identity Verification ("CIV") smart card software and solutions, physical security access audits and compliance, and/or physical security identity analytic

software and solutions in at least the United States.

43.     For example, Vector Flow's website states that it offers solutions for "Solving Physical Access Compliance Challenges,"[1] a "Physical Workforce Identity Product Suite,"[2] and a "Physical Identity and Access Manager (PIAM),"[3] just to name a few. Vector Flow's products are highly similar to products that Defendants developed at Quantum Secure and HID, and therefore the Defendants' contribution to the Vector Flow products is an act of direct competition with HID.

44.     This, standing alone, is enough to show that the Defendants have each breached their respective Non-Competition and Non-Solicitation Agreements with HID. But Vector Flow's products are, on information and belief, more advanced than would be expected without a head start from use of HID's source code. HID is informed and believes that HID's source code forms the foundation of the Vector Flow products and that Defendants used HID's source code to develop those products, suggesting the Defendants not only improperly compete with HID through Vector Flow, but also that they used their access to HID's trade secrets to further that improper competition.

45.     Several features that Vector Flow touts for its offerings demonstrate, on information and belief, that Defendants used HID source code as the foundation for Vector Flow's products. On its website, Vector Flow provides the following screenshot of its product:

---

[1] https://vectorflow.com/physical-workforce-identity-solutions/
[2] https://vectorflow.com/platform-overview/physical-workforce-identity-suite/
[3] https://vectorflow.com/wp-content/uploads/VectorFlow_DataSheet_PIAM_5.21.21_WEB.pdf



See https://vectorflow.com/wp-content/uploads/Identity-Manager_PIAM.png.[4] On the far left side, there is a top level menu, with the entry for "Identity Manager" selected. It appears that an individual Identity for someone named "Shawn Terry" is selected, and below a thumbnail of that person's Identity, there is a menu comprising: Summary, Identity Profile, Cards, Access Areas, Delegates, Vehicles, Documents, Team, Requests, Tasks, Advisories, History, Interface Status, Administration.

46.    This list indicates that Vector Flow's product includes features that, on information and belief, could not have been developed during Vector Flow's corporate existence without use of HID's trade secret source code.

47.    For example, a "History" feature is nice to have, and customers would eventually

---

[4] *See also* https://www.youtube.com/watch?v=ug9kR7NqbhE&t=1217s at 8:30 – 12:15 (Vector Flow's VP of Customer Experience, Tina Huston, illustrating Vector Flow's Identity Manager module); https://vectorflow.com/leadership-team/

request it, but it would not be a feature expected in a brand new identity management program.

48.     The "Delegates" feature is also an unlikely addition for a new product. Setting up a system to delegate and revoke permission is complicated, and while larger customers may request it, it is not typically a critical day-one feature, but rather a later addition after a customer is already on-boarded and has a functioning system. It, therefore, would be unlikely to appear in a from-scratch early version of any identity management software.

49.     "Teams" suggests a reporting structure, which is an advanced identity management function with narrow use cases.

50.     "Vehicles" appears to reference a niche application that Vector Flow would have little to no reason to build from scratch so early on.

51.     "Advisories" is likely a form of observations about the employee used for risk management--yet another late stage and complicated feature that should not exist in a new company's product.

52.     Interface Status and Photo Renewal features are also types of functionality that indicate a late-stage product, with years of specific requests from customers and specific solution development that should not exist in a newer offering like Vector Flow's unless, on information and belief, it was based on a pre-existing code base.

53.     Other than being suspiciously advanced for its young age, some of the apparent features of Vector Flow's product reflect idiosyncrasies in HID's code base that, on information and belief, are carryovers from that code base. For example, the profile shown above asks for the "Mobile Carrier." HID's products include this functionality, but the feature was added to HID's product as a specific workaround for a niche problem. There is usually no reason for a company to track this information, and when they do need the information, there are very inexpensive

options for determining the carrier automatically.

54.    Another screen shot from the Vector Flow product shows still more suspicious

features:



*See* https://vectorflow.com/physical-workforce-identity-solutions/;[5] *see also*

https://vectorflow.com/ai-enabled-next-generation-piam-technology-webinar.

55.    The "Rec" and "Time Code" fields are both advanced, niche features that have

appeared in HID's software but, on information and belief, are highly unlikely to appear in a new

program built from the ground up. "Site" suggests location based functionality, another complex

piece of code.

56.    Based on the Defendants' access to HID source code and on what HID knows

---

[5] This screen shot is also available on the Vector Flow website at https://vectorflow.com/wp-content/uploads/My-Task-1.png

about Vector Flow's products and services, HID alleges on information and belief that

Defendants misappropriated HID's source code and used that source code in Vector Flow's

competing products.

## FIRST COUNT
## BREACH OF CONTRACT

57.     HID repeats and re-alleges all allegations contained in ¶¶ 1-56 above as if fully

set forth herein.

58.     On or about February 9, 2015, Ajay Jain, Vikrant Ghai, and Shailendra Sharma

each entered into valid and enforceable Non-Competition and Non-Solicitation Agreements with

HID.

59.     HID performed all of its obligations under each Defendant's Non-Competition

and Non-Solicitation Agreement.

60.     Ajay Jain breached the Non-Competition and Non-Solicitation Agreement by,

among other actions, developing a competing product and founding Vector Flow to engage in a

"Restricted Business" in a "Restricted Area" during the five-year "Restricted Period," as those

terms are used in the Non-Competition and Non-Solicitation Agreement. Ajay Jain has also

breached the Non-Competition and Non-Solicitation Agreement by authorizing use of his name

in connection with Vector Flow during the "Restricted Period," and, upon information and belief,

soliciting and inducing HID's customers to use Vector Flow's products instead of HID's

products. Ajay Jain's breaches have harmed HID by at least the costs of investigating the

breaches and the loss of business and goodwill from those breaches. HID is entitled to recover

from Ajay Jain the damages caused by his breaches of the Non-Competition and Non-

Solicitation Agreement and, while the amount of those damages cannot be determined at this

time, it will be proven at trial. HID is also entitled to recover all gains, profits, and advantages

that he obtained as a result of these breaches, which are not currently ascertainable, but will be proven at trial.

61.     Moreover, Ajay Jain acknowledged and agreed that a breach of the Non-Competition and Non-Solicitation Agreement would cause HID irreparable harm, would entitle HID to obtain injunctive relief, and result in an extension of the Restricted Period by the same amount of time that Ajay Jain was in breach of such agreement. Indeed, HID has suffered and will continue to suffer irreparable harm based on Ajay Jain's breach of the Non-Competition and Non-Solicitation Agreement and, accordingly is entitled to an award of injunctive relief and an extension of the Restricted Period for the time equal to Ajay Jain's breach.

62.     Vikrant Ghai breached the Non-Competition and Non-Solicitation Agreement by, among other actions, developing a competing product and founding Vector Flow to engage in a "Restricted Business" in a "Restricted Area" during the five-year "Restricted Period," as those terms are used in the Non-Competition and Non-Solicitation Agreement. Vikrant Ghai has also breached the Non-Competition and Non-Solicitation Agreement by authorizing use of his name in connection with Vector Flow during the "Restricted Period," and, upon information and belief, soliciting and inducing HID's customers to use Vector Flow's products instead of HID's products. Vikrant Ghai's breaches have harmed HID by at least the costs of investigating the breaches and the loss of business and goodwill from those breaches. HID is entitled to recover from Vikrant Ghai the damages caused by his breaches of the Non-Competition and Non-Solicitation Agreement and, while the amount of those damages cannot be determined at this time, it will be proven at trial. HID is also entitled to recover all gains, profits, and advantages that he obtained as a result of these breaches, which are not currently ascertainable, but will be proven at trial.

63.     Moreover, Vikrant Ghai acknowledged and agreed that a breach of the Non-Competition and Non-Solicitation Agreement would cause HID irreparable harm, would entitle HID to obtain injunctive relief, and result in an extension of the Restricted Period by the same amount of time that Vikrant Ghai was in breach of such agreement. Indeed, HID has suffered and will continue to suffer irreparable harm based on Vikrant Ghai's breach of the Non-Competition and Non-Solicitation Agreement and, accordingly is entitled to an award of injunctive relief and an extension of the Restricted Period for time equal to Vikrant Ghai's breach.

64.     Shailendra Sharma breached the Non-Competition and Non-Solicitation Agreement by engaging in a "Restricted Business" in a "Restricted Area" during the five-year "Restricted Period," as those terms are used in the Non-Competition and Non-Solicitation Agreement. Shailendra Sharma's breaches have harmed HID by at least the costs of investigating the breaches and the loss of business and goodwill from those breaches. HID is entitled to recover from Shailendra Sharma the damages caused by his breaches of the Non-Competition and Non-Solicitation Agreement and, while the amount of those damages cannot be determined at this time, it will be proven at trial. HID is also entitled to recover all gains, profits, and advantages that he obtained as a result of these breaches, which are not currently ascertainable, but will be proven at trial.

65.     Moreover, Shailendra Sharma acknowledged and agreed that a breach of the Non-Competition and Non-Solicitation Agreement would cause HID irreparable harm, would entitle HID to obtain injunctive relief and result in an extension of the Restricted Period by the same amount of time that Shailendra Sharma was in breach of such agreement. Indeed, HID has suffered and will continue to suffer irreparable harm based on Shailendra Sharma's breach of the Non-Competition and Non-Solicitation Agreement and, accordingly is entitled to an award of the

Non-Competition and Non-Solicitation Agreement and an extension of the Restricted Period for time equal to Shailendra Sharma's breach.

66.     Ajay Jain, Vikrant Ghai and Shailendra Sharma further breached Section 1.1(d) of their respective Non-Competition and Non-Solicitation Agreements by failing to comply with the covenant, that remained in effect during the five-year "Restricted Period", not to "solicit, encourage, recruit or induce any employee, independent contractor or consultant of the Company (including any employee, independent contractor or consultant of the Company whose employment or engagement with the Company ended due to a voluntary resignation within three months prior to such solicitation) to terminate his or her employment or consulting relationship with the Company (or Parent or any of its Affiliates) or to become employed or engaged by Shareholder or any third party."  Ajay Jain, Vikrant Ghai and/or Shailendra Sharma committed this  breach of Section 1.1(d) of their Non-Competition and Non-Solicitation Agreements for the purpose of harming the goodwill, business and stable workforce of HID and assisting Defendants in breaching their covenants not to compete under the Non-Competition Agreements.  The breaches of Section 1.1(d) of the Non-Competition and Non-Solicitation Agreements by Ajay Jain, Vikrant Ghai and/or Shailendra Sharma have harmed HID by at least the costs of investigating the breaches, the loss of business and goodwill from those breaches, and the harm caused by the recruitment and hiring away of HID's employees.  HID is entitled to recover from Ajay Jain, Vikrant Ghai and/or Shailendra Sharma the damages caused by his breaches of Section 1.1(d) of the Non-Competition and Non-Solicitation Agreements and, while the amount of those damages cannot be determined at this time, it will be proven at trial. HID is also entitled to recover all gains, profits, and advantages that he obtained as a result of these breaches, which are not currently ascertainable, but will be proven at trial.

67.     Based on each Defendants' breach of the Non-Competition and Non-Solicitation Agreements, HID is entitled to an award of its reasonable attorneys' fees and costs pursuant to the terms of Section 11.4 of the Non-Competition and Non-Solicitation Agreements.

## SECOND COUNT
## TRADE SECRET MISAPPROPRIATION

68.     HID repeats and re-alleges all allegations contained in ¶¶ 1-67 above as if fully set forth herein.

69.     HID owns and possesses certain trade secret documents and information as alleged above, including its source code.

70.     On information and belief, during the course of their employment with Quantum Secure, each Defendant was granted access to confidential and proprietary information, including Quantum Secure's source code. All of that information, including source code, became HID's trade secret information when it acquired Quantum Secure. During the course of their employment with HID, each Defendant continued to have access to the legacy Quantum Secure confidential and proprietary information (now owned by HID), and was granted access to HID's trade secret information, including HID's source code. At all relevant times, each Defendant owed a duty to HID to maintain the secrecy of HID's trade secrets and to refrain from use of those trade secrets other than for HID's business.

71.     None of this trade secret information is available to the public, and HID closely guards this information and keeps this information strictly confidential in order to maintain an advantage in its highly competitive business. HID takes reasonable measures to keep this information secret.

72.     HID derives independent economic value from this information not being generally known to the public and not being readily ascertainable through proper means by

anyone who could obtain economic value from the disclosure or use of the information.

73.     HID's trade secret information is related to HID's products and/or services intended for use in, and used in, interstate and foreign commerce.

74.     On information and belief, Defendants misappropriated HID's trade secrets in the unlawful manner alleged herein by acquiring, using, and/or disclosing HID's trade secrets, at least, in breach of their duties to HID to maintain the secrecy of those trade secrets. On information and belief, their misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. At the time of the misappropriation, all of that information was an HID trade secret.

75.     On information and belief, each Defendant knew that their actions were unauthorized because they all knew that HID's trade secrets, including its source code, was secret and that HID would be harmed if that source code were shared with any competitors, including Vector Flow.

76.     On information and belief, Defendants have used HID's source code and other trade secrets to create a product and launch a company that competes directly with HID and its products, thereby causing damage to HID. If Defendants are not enjoined, they will continue to use HID's source code and other trade secrets to compete with HID. Defendants' conduct therefore represents a continuing threat for which HID has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use HID's source code and HID will continue to suffer severe and irreparable damage as a result. 18 U.S.C. § 1836(b)(3)(A) therefore entitles HID to an injunction.

77.     HID is also entitled to recover damages from Defendants for their misappropriation of HID's trade secrets. The amount of such damages cannot be determined at

this time but will be proven at trial. HID is further entitled to recover any gains, profits, advantages, and unjust enrichment that Defendants obtained as a result of the misappropriation alleged herein. HID is currently unable to ascertain the full extent of these gains, profits, and advantages but will prove the value thereof at trial.

## JURY DEMAND

78.     HID demands a jury trial as to all issues that are triable by a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, HID respectfully requests the following relief:

1. For Judgment in HID's favor against Defendants on all causes of action alleged herein;

2. For injunctive relief;

3. For compensatory and consequential damages in an amount to be proven at trial;

4. For restitution and disgorgement of Defendants' unjust enrichment;

5. For costs of suit incurred;

6. For prejudgment interest;

7. For attorney's fees and costs; and

8. For such other and further relief as the Court may deem to be just and proper.

Dated:  December 17, 2021

**O'Melveny & Myers LLP**

By:

Marc J. Pensabene
mpensabene@omm.com
Times Square Tower, 7 Times Square
New York, NY 10036
Telephone: 212-326-2000
Facsimile: 212-326-2061

David R. Eberhart (*Pro Hac Vice*
Forthcoming)
deberhart@omm.com
Sorin G. Zaharia (*Pro Hac Vice* Forthcoming)
szaharia@omm.com
Two Embarcadero Center
28th Floor
San Francisco, CA 94111
Telephone: 415-984-8700
Facsimile: 415-984-8701

Eric Amdursky (*Pro Hac Vice* Forthcoming)
eamdursky@omm.com
Patrick Nack-Lehman (*Pro Hac Vice*
Forthcoming)
pnack-lehman@omm.com
2765 Sand Hill Road
Menlo Park, California 94025
Telephone: 1 650 473 2600
Facsimile: 1 650 473 2601

*Attorneys for Plaintiff*
*HID Global Corporation*